STATE OF VERMONT

ENVIRONMENTAL COURT

|  |  |  |
|---|---|---|
| | } | |
| Eustance Act 250 Jurisdictional Opinion (#2-231) | } | Docket No. 13-1-06 Vtec |
| (Appeal of Eustance) | } | |
| (Cross-Appeal of Solomon) | } | |
| | } | |
| | } | |

Decision and Order on Cross-Motions for Partial Summary Judgment

Appellants Robert and Lourdes Eustance and Cross-Appellants Harold and Valerie Solomon appealed from Jurisdictional Opinion #2-231, issued by the District 2 Environmental Coordinator on December 23, 2005. Appellants are represented by Elizabeth A. Boepple, Esq.; Cross-Appellants are represented by David L. Grayck, Esq. and Christopher J. Smart, Esq.; the Vermont Natural Resources Board is represented by Melanie Kehne, Esq.; and the Vermont Agency of Agriculture is represented by Michael O. Duane, Esq.

Appellants and Cross-Appellants have both moved for summary judgment on the applicability of Act 250 and former Environmental Board Rule 34(A) to Appellants' activities. The following facts are undisputed unless otherwise noted.

An approximately 162-acre parcel of undeveloped land on French Hollow Road in the Town of Winhall was purchased by Arthur Hurst and James Ellis in 1985; they appear to have divided[1] it into two parcels in 1986: approximately 79.55 acres owned by Mr. Hurst and approximately 82.55 acres owned by Mr. Ellis. Mr. Hurst constructed a vacation home on his parcel in 1986; Mr. Ellis constructed a vacation home on his parcel in 1987.

---

[1] The permit status of this division is not at issue in the present case.

A 40.05-acre portion of the original Hurst parcel, including the house, will be referred to in this decision as the Hurst Lot or the Hurst/Solomon Lot; it is now owned by Cross-Appellants Solomon. A 47.64-acre portion of the original Ellis parcel, including the house, will be referred to in this decision as the Ellis Lot or the Ellis/Eustance Lot; it is now owned by Appellants Eustance.

Cross-Appellants Solomon entered into a purchase and sale agreement to purchase the Hurst Lot, including the house, in January of 1991. In April and July of 1991, Mr. Hurst and Mr. Ellis (the Hurst/Ellis Applicants) applied for an Act 250 permit for what is described in their 1993 Motion to Alter as a ten-lot project. However, by September 9, 1991, they had filed a new or revised application[2] for the project, known as the "Settlement at French Hollow," described in the 1993 Act 250 Permit as a proposal to subdivide the original 162-acre property into fourteen[3] lots (thirteen residential lots, including the Hurst house lot and the Ellis house lot, plus a lot containing the roadway and club area).

The Hurst/Ellis Applicants had obtained state subdivision permits (showing that the lots could support wastewater disposal systems) from the Agency of Natural Resources for five of those lots: Lots 1, 2, 3, 4, and 11; these lots are 5.06 acres, 7.40 acres, 5.03 acres, 5.0

---

[2]  As described on pages 2–3 of the District 2 Commission's May 7, 1993 ruling on the Motion to Alter, in August of 1991 the District Coordinator had requested information on "all lots served by the road, all contiguous land owned by the applicants and any lots sold by the applicants after the intent to subdivide was evident." The Hurst/Ellis Applicants' response to this request by letter dated September 9, 1991 is the basis for the inclusion of the Hurst/Solomon and Ellis/Eustance parcels in the overall project and in the coverage of the Act 250 Permit.

[3]  The lot numbers used in this decision are taken from page 3 of the Findings of Fact and Conclusions of Law for Act 250 Permit #2W0908 issued on February 23, 1993. The parties have not provided a plan of the original 162-acre project, such as the December 30, 1989 subdivision plan referred to as Exhibit 30 on page 3 of the District 2 Commission's May 7, 1993 ruling on the Motion to Alter, nor have they provided any of the 1991 Act 250 permit applications.

acres, and 5.02 acres in size, respectively.  Under the state subdivision program, so-called deferrals of permit had been issued for a further five lots: Lots 5, 6, 7, 8, and 14; these lots are 5.13 acres, 5.10 acres, 5.09 acres, 5.09 acres, and 5.0 acres in size, respectively.  The deferrals of permit allowed those lots to be subdivided but did not allow any development on the lots until water supply and wastewater disposal permits would have been obtained. Lot 14 was not proposed as a residential building lot; rather, it contained the project roadway and a storage building/club area which later was issued a water supply and wastewater disposal permit.  The remaining four lots were Lot 9 (10.42 acres), Lot 10 (10.05 acres), Lot 12 (the Hurst Lot: 39.01[4] acres) and Lot 13 (the Ellis Lot: 47.64 acres).

In July of 1989, the Hurst/Ellis Applicants had received municipal approval of three lots, described in their 1993 Motion to Alter as a 33.94-acre lot and a 40.05-acre lot (some form of the Ellis Lot and the Hurst Lot), together with a 5.02-acre lot that later received a state subdivision permit and appears to be the same lot as that referred to as Lot 11 in the 1993 Act 250 permit.  Mr. Hurst transferred the 40.05-acre Hurst/Solomon Lot to the Solomons on May 29, 1992.  The Hurst/Ellis Applicants formed the Hurst/Ellis Development Corporation on September 8, 1992.

The District 2 Environmental Commission issued Act 250 Land Use Permit #2W0908 (the 1993 Act 250 Permit) on February 23, 1993, authorizing the Hurst/Ellis Applicants as permittees "to create" the five lots (Lots 1, 2, 3, 4 and 11) that had received state permits; to construct the portion of the road and utilities needed to serve Lots 1 through 4; and to construct the storage building, tennis courts and parking in the "Club Area."  The 1993 Act 250 Permit specifically stated that "any sale, further construction, or subdivision of the remaining eight lots comprising the balance of this 162 acre tract of land" (including the Hurst/Solomon Lot and the Ellis Lot) "is specifically not approved without an amendment"

---

[4]  The 1993 Motion to Alter stated that its correct acreage is 40.05 acres; this correction was made in the Revised 1993 Permit.

3

to the 1993 Act 250 Permit.

The Hurst/Ellis Applicants moved to alter the 1993 Act 250 decision. They requested that the permit be issued to the Hurst/Ellis Development Corporation. With respect to the so-called "scope of review," the Motion to Alter laid out a chronology of the development; stated that the permit as issued included the "Hurst residence parcel now owned by Solomon" as well as a "5.02 acre parcel . . . also no longer owned by Hurst or Ellis;" and requested that the District Commission "delete all conditions and restrictions imposed on lots created and developed prior to the submission of Act 250 application 2W0908." With respect to Finding of Fact 1(B)(4), the Motion to Alter stated that:

> The lands listed as the 39.01 acres (correct acreage is 40.05 acres) and the 47.64 acre lots refer to the Solomon and Ellis home sites. Both parcels were developed six or seven years ago and are not part of The Settlement at French Hollow. (See above chronology.) The applicants request that the Commission delete any reference to these parcels and the requirement for permit amendment prior to any further use of those lands.

The District Commission ruled on the Hurst/Ellis Applicants' Motion to Alter, granting some of the requests and denying others, and issued Permit #2W0908 (Revised) (the Revised 1993 Act 250 Permit) on May 7, 1993. The decision specifically denied the Hurst/Ellis Applicants' request to omit the Hurst/Solomon Lot and the Ellis Lot from the Act 250 Permit. The decision noted, in addition, that the Commission "regard[s] the transfer of the 40.05[-acre] lot to Solomon prior to the issuance of this permit as a violation." The Revised 1993 Act 250 Permit reiterated the language from the 1993 Act 250 Permit that "any sale, further construction, or subdivision of the remaining eight lots comprising the balance of this 162 acre tract of land," that is, including the Hurst/Solomon Lot and the Ellis Lot, "is specifically not approved without an amendment to this permit." The Revised 1993 Act 250 Permit also included standard language (also found in the original 1993 Act 250 Permit) requiring the project to be completed according to the

4

approved plans; that "no changes shall be made in the project without the written approval" of the District Commission; and that:

> By acceptance of the conditions of this permit without appeal, the permittees confirm and agree for themselves and all assigns and successors in interest that the conditions of this permit shall run with the land and the land uses herein permitted, and will be binding upon and enforceable against the permittees and all assigns and successors in interest.

The Revised 1993 Act 250 Permit also contained provisions governing development of the entire project, including compliance with a stormwater permit, with a wetlands conditional use determination, with the state water supply and wastewater disposal permits and the state subdivision permits applicable to certain of the lots, and adherence to erosion control measures and other stream protection requirements during construction. In issuing the Revised 1993 Act 250 Permit, the District 2 Commission found that the site plan provided adequate protection of the wetlands on the project site, including the function of the forested wetlands as providing habitat and a critical spring food source for black bear, with a condition requiring supplemental plantings.

With respect to future development of the Solomon and Ellis/Eustance Lots, the District Commission's Findings of Fact and Conclusions of Law for the Revised 1993 Act 250 Permit specifically found that, to approve any development proposal for those lots, it would need more information regarding whether the lots could accommodate sewage disposal; regarding the effect of such development on wetlands (as those lots were not covered by the Conditional Use Determination); regarding the aesthetic impact of any "additional development" on either lot; and regarding agricultural soils and forestry soils (as the application did not provide soils information for those lots and they were not covered by the forestry management plan applicable to the other lots.

No appeal was taken from the District 2 Environmental Commission's decision on the Revised 1993 Act 250 Permit, which therefore became final.

5

Thereafter, the Revised 1993 Act 250 Permit was amended three times, twice with respect to the Solomon Lot, and once with respect to more of the originally-proposed lots. In 1995, Cross-Appellants Solomon received approval to add an addition to their house, and in 1999 they received approval to construct a pond on their property. On December 29, 1995, the Commission issued an amendment authorizing the Hurst/Ellis Applicants to develop Lots 5, 6, and 7 with "related roads and infrastructure."

Appellants Eustance purchased the Ellis/Eustance Lot on June 30, 1999. At that time, it contained the existing vacation house, but no other buildings; the majority of that property was forested.

On May 31, 2005, Appellants Eustance filed an application to amend the Revised 1993 Act 250 Permit, seeking approval of their as-built residence and alpaca farming and retail operation on their property. As described in the application, the development consisted of a single-family four-bedroom residence[5] on an approximately 6.1-acre portion of the site, and an alpaca farm on an approximately 9.9-acre[6] portion of the site, with approximately 31 acres undeveloped. The application stated that approximately 7.4 acres of woodland had been cleared for the pasture, the pond, and for one of the three barns.

---

[5] The notice of application and hearing, on the other hand, describes "Barn C" as a "30-foot x 40-foot building with a single family house." However, from the listers' appraisal information, the dwelling appears to be a separate building from the three barns, but Barn A and Barn B are adjoining and offset from one another. From the photographs it appears that it is the 30' x 30' Barn B that has the upper story 30' x 30' Fiber Studio, which would make the measurements congruent, as it is five feet wider than Barn A. The Court is handicapped to some extent by not having the plan or diagram of the property that must have been provided as part of the Act 250 permit application. However, as the only construction on the property at the time of the Revised 1993 Act 250 Permit was a vacation house, the sequence and description of the subsequent construction are not material to the Court's analysis of the parties' pending motions.

[6] The parties dispute, however, whether the farming operations on the parcel affect more than this area.

6

The application characterized "Barn A" as a 25' x 50', two-story wooden building with a concrete floor, with animal stalls and a veterinarian room on the ground floor, and with a 30' x 30' finished room on the second story used as a "Fiber Studio." The application characterized "Barn B" as a 30' x 30' wooden building with a concrete floor and stalls for animals.

In connection with the farming operation, Appellants advertise alpaca breeding and stud services. Appellants also operate a retail store in the Barn A/B complex, in which they store and sell alpaca fiber from their own animals and also sell alpaca products manufactured elsewhere in the United States and in South America. The fiber studio has access to a toilet for the use of Appellants and their employees.

The application characterized "Barn C" as a 30' x 40' wooden building with a concrete floor, with a 30' x 30' addition under construction. In addition to the barns, there are two three-sided bins each approximately 10' x 10' x 4' in size, for collecting the animals' manure and straw, which is removed "regularly" and composted off the premises. The application also described "an approximately 80' x 100' x 8' (64,000 cubic feet) man-made pond to catch surface runoff within the farm acreage."

Currently, Appellants keep approximately fifty-three alpacas and five llamas on the property. The fencing surrounding areas on the property, to contain the animals and protect them from predators, was also installed at some time after Appellants purchased the property. Appellants also host two two-day[7] alpaca husbandry seminars annually, which are attended by between fifty and seventy-five people. Appellants also conduct weekend tours of the property.

A fifty-foot-wide right-of-way extending northerly from French Hollow Road is located at the boundary between Appellants' and Cross-Appellants' property. Appellants' driveway is located approximately 148 feet down the right-of-way from French Hollow

---

[7] The attendees do not stay overnight at the property.

Road. Cross-Appellants' driveway is located approximately an additional 270 feet farther along the right-of-way past Appellants' driveway.

In 2001, Appellants constructed an additional driveway, directly across from Cross-Appellants' driveway, giving more direct access to Barn B and the manure bins. Barn B and the manure bins are visible from the intersection of Cross-Appellants' driveway and the right-of-way. The manure bins are located approximately 100 feet from the right-of-way (the shared property boundary) and approximately 300 feet from Cross-Appellants' house. They are visible from Cross-Appellants' house when the leaves are off the trees. Appellants use the second driveway for trucks and other farm vehicles and equipment to access the barns. That driveway is used by a truck which removes alpaca manure from the property twice a day: once in the early morning and once in the afternoon.

The parties dispute whether the manure bins regularly emit an odor that can be perceived beyond the property line. The parties also dispute whether Appellants' farming operation and associated construction has complied with the fifty-foot buffer to wetlands established in the Revised 1993 Act 250 Permit; and whether Appellants' farming operation is conducted in compliance with the Vermont Agency of Agriculture's Accepted Agricultural Practices. However, these disputed facts are not material to the Court's analysis of the parties' pending motions.

Appellants' application to the District 2 Environmental Commission for approval of their as-built residence and farming and retail operation, as an amendment to the Revised 1993 Act 250 Permit, was heard by the District Commission on July 26, 2005. The District Commission recessed the hearing, requesting further information from Appellants. Appellants filed an attempted appeal of the recess memorandum (Environmental Court Docket No. 160-8-05 Vtec), which was dismissed on the basis that the District Commission had not issued a final, appealable decision. Meanwhile, the District Coordinator had issued Jurisdictional Opinion #2-231, which determined that Appellants' alpaca farm and related

8

construction and clearing activities 1) required an amendment to the Revised 1993 Act 250 Permit under that permit's express terms; 2) are subject to Act 250 amendment jurisdiction even though they include "farming activities," and 3) require an amendment to the Revised 1993 Act 250 Permit as a material or substantial change to the construction and activities approved in the Revised 1993 Act 250 Permit and its subsequent amendments. The present appeal is of that Jurisdictional Opinion.

The Express Terms of the Revised 1993 Act 250 Permit

Cross-Appellants argue that Appellants' farm and retail operation constitutes "further construction" under the terms of the Revised 1993 Act 250 Permit and requires a permit amendment for that reason.

As discussed above, the Revised 1993 Act 250 Permit was not appealed, and therefore became final. It included both the Hurst/Solomon Lot and the Ellis/Eustance Lot and expressly prohibited "any sale, further construction, or subdivision" of those lots without a further amendment to the Revised 1993 Act 250 Permit. This provision resulted from the District Commission's denial of the Hurst/Ellis Applicants' request to exempt these two lots from the operation of the permit. The Revised 1993 Act 250 Permit also required the project to be completed according to the approved plans, stated that "no changes shall be made in the project without the written approval" of the District Commission, and bound the permittees and their successors in interest to its conditions.

Therefore, by virtue of the finality of the Revised 1993 Act 250 Permit, under its express terms, Mr. Ellis was required to seek an amendment of that permit from the District Commission for the sale of the property to Appellants Eustace, and they were required to seek further amendments of the Revised 1993 Act 250 Permit prior to their constructing any barns, fencing, manure structures, ponds, or other related infrastructure necessary to support their alpaca farming, retail, or educational operations. That is, regardless of

9

whether Appellants' activities would have been exempt as "farming" if the property had not already been subject to an Act 250 permit, under the terms of the Revised 1993 Act 250 Permit, Appellants were required to seek approval of the Commission prior to construction of improvements for those activities.

Moreover, as successors to the original permittee, Appellants are obligated to continue to comply with the conditions of the Revised 1993 Act 250 Permit (and other state permits referred to in the Revised 1993 Act 250 Permit) that pertain to Appellants' portion of the original property, including adherence to erosion control measures; a prohibition on the discharge of waste material into any surface waters; maintenance of a fifty-foot buffer strip protecting all watercourses; compliance with the storm water permit; requirements regarding the disposal of stumps and slash; and compliance with conditions of the wetlands Conditional Use Determination.

Summary judgment is therefore GRANTED in favor of Cross-Appellants that a permit amendment is required pursuant to the express terms of the Revised 1993 Act 250 Permit.


Act 250 Amendment Jurisdiction

Appellants and the Agency of Agriculture argue that Act 250 does not have jurisdiction over Appellants' farming and associated retail[8] and educational operation, because farming does not constitute "development" under Act 250, and therefore, that Appellants are not required to obtain approval of an amendment to the Revised 1993 Act 250 Permit.

Several statutory and regulatory provisions govern the analysis of this issue. In

---

[8] We do not here determine whether the retail sale of products not produced on the property or on other leased property may or may not fall within the farming exemption. See In re Ochs, 2006 VT 122, ¶¶12, 13 (exemptions generally to be read narrowly).

10

general, Act 250 jurisdiction and the requirement of obtaining an Act 250 permit attaches when "development" is proposed for certain lands and when construction is proposed on a development. 10 V.S.A. § 6081(a). The term "development" excludes the "construction of improvements for farming, logging, or forestry purposes below the elevation of 2,500 feet." §6001(3)(D)(i). "Farming" is defined to include "the raising, feeding, or management of livestock." §6001(22)(B). Thus, ordinarily "farming" does not constitute "development" and does not trigger original Act 250 jurisdiction. Moreover, the statute was amended in 2004 to clarify that, when development is proposed for a tract of land that is devoted to farming, only those portions of the land "that support the development shall be subject to regulation under" Act 250, and that permits "shall not impose conditions on other portions" of the property. §6001(3)(E).

However, the issue of Act 250 jurisdiction over a parcel of land proposed for development is "determined at the commencement of the project." In re Wildcat Constr. Co., Inc., 160 Vt. 631, 632 (1993). Even §6001(3)(E), by its terms, only applies when a portion of farm property is proposed for development, not when a portion of development property is proposed for farming.

Once Act 250 jurisdiction attaches to a project, it thereafter runs with the land. Id.; In re Estate of Swinington, 169 Vt. 583, 585 (1999) (mem.) (citing former Environmental Board Rules (Envtl. Bd. R.) 32(B) and 33(C)); Re: New Haven Savings Bank, Docket No. 2W0769-1-EB, Order at 8 (Envtl. Bd[9]., Nov. 23, 1992).

Once Act 250 jurisdiction has attached, it does not "detach" from a parcel unless the permit has expired, In re Huntley, 2004 VT 115, ¶12; 177 Vt. 596, 599 (2004), or unless the proposed activity is governed by an alternative statutory scheme giving another state agency exclusive jurisdiction to regulate it. Glebe Mountain Wind Energy, LLC, Docket No. 234-11-05 Vtec (Vt. Envtl. Ct., Aug. 3, 2006) (wind turbine facility not subject to Act 250

---

[9] See 10 V.S.A. § 8504(m).

11

jurisdiction, even though activity proposed for land subject to an existing Act 250 permit, because facility regulated independently by Public Service Board).

Once Act 250 jurisdiction has attached, former Environmental Board Rule[10] 34(A) requires a permit amendment to be obtained "for any material or substantial change in a permitted project, or any administrative change in the terms and conditions of a land use permit." Former Rule 34(A) further provides that "continuing jurisdiction over all development and subdivision permits is vested in the district commissions."

Thus, once Act 250 jurisdiction has attached to a project, subsequent changes to a permit's terms and conditions, or material or substantial changes in a permitted project, require a permit amendment, see e.g., In re: Dover Valley Trail, Docket No. 88-4-06 Vtec, slip op. at 5 (Vt. Envtl. Ct., Jan. 16, 2007), even if the newly-proposed activities would not themselves have triggered the permit requirement. Given the public process for issuance of an Act 250 permit, it is reasonable for neighboring landowners and prospective purchasers of neighboring property to rely upon the terms and conditions of a permit governing future activity on the property, or at least to rely on their right to be heard in an amendment proceeding regarding any proposed changes to the permit or to the property covered by the permit.

Appellants argue that, because they are engaged in "farming," their activities should be entirely exempt from Act 250 jurisdiction, even though the property was subject to an Act 250 permit when they purchased it. While the so-called farming exemption from Act 250 jurisdiction serves an important function in preserving individual farms and Vermont's strong farming tradition, it is not an unlimited exemption, especially in the context of land that has already received and been sold subject to an Act 250 permit binding successors in

---

[10] Because Appellants filed their application before the May 1, 2006 effective date of the revised rules promulgated by the Natural Resources Board, the former version of the Environmental Board Rules governs this application.

12

interest. Rather, other considerations come into play, including reliance on the terms of an issued Act 250 permit by other parties, such as the state regulatory agencies and neighbors who participated in the Act 250 permit proceedings, and later purchasers of neighboring property or purchasers of property in the development.

Moreover, the principles of land management embodied in the Act 250 criteria could no be implemented through the permitting program if subsequent exemptions could remove land from the ambit of an issued permit. See also In re Rusin, 162 Vt. 185, 189-190 (1994) (road construction activities that would not have triggered original Act 250 jurisdiction on undeveloped land were nevertheless subject to an existing Act 250 permit already obtained for proposed development on that land).

Therefore, Appellant's and the Agency of Agriculture's motions for summary judgment are DENIED and summary judgment is GRANTED to Cross-Appellants and the Natural Resources Board that a permit amendment is required for farming development that could otherwise be exempt, because the property is already subject to an Act 250 permit.

Former Environmental Board Rule 34(A) –- Material or Substantial Change

An Act 250 permit allows a property owner "to conduct the improvements specifically authorized by the permit, but no more than that." In re: Mountainside Properties, Inc. Land Use Permit Amendment, Docket No. 117-6-05, slip op. at 4 (Vt. Envtl. Ct., Dec. 13, 2005); see In re Stowe Club Highlands, 166 Vt. 33, 37 (1996). When a party wishes to conduct or engage in any other "material or substantial" changes to the development authorized in the original permit, a permit amendment is required. Former Envtl. Bd. R. 34(A); In re: Dover Valley Trail, Docket No. 88-4-06 Vtec, slip op. at 5 (Vt. Envtl. Ct., Jan. 16, 2007).

Cross-Appellants and the Natural Resources Board argue that Appellants' farming

operation and previous construction and clearing activities constitute material or substantial changes to the development authorized by the Revised 1993 Act 250 Permit and that Appellants must therefore obtain an amendment pursuant to former Environmental Board Rule 34(A). Cross-Appellants cite the construction of the barns, manure bins, the pond, the clearing of pasture land, and the construction of a second driveway, as well as the retail sales function and the presentation of annual seminars, as material or substantial changes.

As of the issuance of the Revised 1993 Act 250 Permit, not even the existing vacation house on the Ellis/Eustance Lot was approved under the permit. The status of the Ellis/Eustance Lot was that only the house had been built on the property, as a vacation home, and that the District Commission had inadequate information to determine whether the property could accommodate the on-site disposal of sewage so as to meet Criterion 1(B). Similarly, the Commission lacked specific information with regard to wetlands, aesthetics, wildlife habitat, and forestry soils, in order for it to make findings on at least Criterion 1(G) with regard to wetlands, Criterion 8 with regard to aesthetics and wildlife habitat, and Criterion 9(B) and (C) with regard to agricultural soils and forestry soils.

Material facts are in dispute, and therefore summary judgment must be denied, as to whether the project as constructed has the potential for significant impact under Criterion 1(B) regarding on-site sewage disposal, and under Criterion 8 regarding aesthetics (noise, odor and visual impacts to Cross-Appellants' property), the two criteria considered by the District Coordinator in the Jurisdictional Opinion. Moreover, the District Commission has not yet ruled Appellants' application to be complete, and therefore has not yet determined whether Appellants' development constitutes a substantial change to the project approved in the Revised 1993 Act 250 Permit, or constitutes a material change with respect to any of the Act 250 criteria considered in the Revised 1993 Act 250 Permit.

Accordingly, based on the foregoing, it is hereby ORDERED and ADJUDGED that Summary Judgment is GRANTED in favor of Cross-Appellants and the Natural Resources Board, that Appellants must apply for Act 250 approval of the as-built and any further proposed development on their property, both because the express terms of the Revised 1993 Act 250 Permit require it, and because the property is already subject to Act 250 jurisdiction, so that the so-called farming exemption does not divest it of jurisdiction. Summary judgment is DENIED, as material facts remain in dispute, regarding whether the current status of Appellants' property constitutes a material or a substantial change under former Environmental Board Rule 34(A). We note that nothing in this decision addresses the merits of Appellants' application; that application remains within the jurisdiction of the District 2 Environmental Commission and is not part of this appeal.

It appears to the Court that it may not be necessary to further litigate the issue of "material or substantial change" in this appeal, as that element of the jurisdictional opinion may be moot in light of this decision. The factual issues of material or substantial change will in any event be addressed, in the first instance, by the District Commission in its proceedings on the permit application. A telephone conference has been scheduled for March 12, 2007 (see enclosed notice), to discuss whether any issues remain in the present appeal. If the parties agree that no issues remain for litigation in the present appeal, they may file an agreed proposed judgment order, concluding this appeal.

Done at Berlin, Vermont, this 16th day of February, 2006.

_____
Merideth Wright
Environmental Judge

15