## In re Stowe Club Highlands

[687 A.2d 102]

No. 95-341

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed November 8, 1996

Motion for Reargument Denied November 22, 1996

*Harold B. Stevens*, Stowe, for Appellant.

*Jeffrey L. Amestoy*, Attorney General, and *John H. Hasen*, Assistant Attorney General, Montpelier, for Amicus Curiae State of Vermont.

**Johnson, J.** Stowe Club Highlands (SCH) appeals a decision of the Environmental Board denying SCH's application for a permit to develop a twenty-two acre Meadow Lot within the Stowe Club development. Both the District Commission and the Board concluded that the proposed development violated the original permit governing the Stowe Club project, and denied the permit modification under the doctrine of collateral estoppel. We reject the application of the doctrine of collateral estoppel under these circumstances, but conclude that the Board properly denied the permit amendment in light of the reliance of the purchasers of lots adjacent to the Meadow Lot. Accordingly, we affirm the Board's decision.

This case began in 1985, when SCH's predecessor, Stowe Club Associates, sought and received an Act 250 permit to develop the 250-acre tract of land now known as Stowe Club. The original permit authorized construction of a 100-unit hotel, a 10,000-square-foot conference center, fifty-five three-bedroom townhouses and a twenty-three lot subdivision. Condition 13 of the original permit states that: "The 40 acre meadow on the project tract shall be retained for agricultural uses for a period of time at least equal to the life of this land use permit." * In addition, the District Commission at the time made findings under 10 V.S.A. § 6086(a)(8) and (9)(B) (Criteria 8 and 9(B)), based on statements in the permit application, that the Meadow Lot would remain open and would be reserved for agricultural uses. Condition 1 of the original permit explicitly incorporates the findings and conclusions of the Commission.

Some changes have occurred in the Stowe Club development since the original permit was issued. Stowe Club Associates and an adjacent farmer, Paul Percy, had entered into an agreement for the sale of the Meadow Lot; that sale did not occur. A 1986 permit amendment allowed construction of community waste disposal fields

---

*The Meadow Lot was later determined to contain twenty-two acres, not the forty acres described in the original permit.

in the Meadow Lot. Also, the planned 100-unit hotel was replaced with a smaller, 21-unit facility.

In 1990, Stowe Club Associates conveyed the project tract to the Chittenden Bank in lieu of foreclosure. The Bank sold a number of single-family house lots adjacent to the Meadow Lot, and in 1992, sold the remaining portion of the tract to Robinson Springs Partnership, which had knowledge of the land use restrictions in the original permit. Appellant SCH is the direct successor in interest of Robinson Springs Partnership.

The Board also found that Leighton Detora, the owner of a lot adjacent to the Meadow Lot and a party below, relied on the fact that the Meadow Lot would remain undeveloped when he purchased his lot and built his residence. Specifically, the Board found that Detora enjoys the agricultural character of the neighborhood, the cows in the nearby pasture, and the lack of light at night from the barn.

## I.

We begin with SCH's threshold argument, that replacing the barn with a smaller residence and stable does not violate the permit condition requiring that the Meadow Lot be retained for agricultural uses. SCH maintains that the smaller residence and stable will increase the amount of open space and not threaten the agricultural potential of the soil. Following this reasoning, the application to develop the Meadow Lot should have been considered independently, and not as an attempt to modify the original permit.

We agree with the Board, however, that building a single-family home on the Meadow Lot is not consistent with preserving the lot for agricultural uses. Merely attaching a stable to a house does not convert a residential development to an agricultural use. In the zoning context, for example, courts have held that ordinances authorizing the use of certain land as a farm do not permit the stabling and training of riding horses. See Borough of Demarest v. Heck, 201 A.2d 75, 79-80 (N.J. Super. Ct. App. Div. 1964); Incorporated Village of Old Westbury v. Alljay Farms, Inc., 476 N.E.2d 315, 316 (N.Y. 1985). There are significant differences between an open meadow with an abandoned barn and a developed lot with a private home. As the Board found, a neighboring landowner enjoys the lack of light at night in the Meadow Lot. Moreover, SCH's interpretation would render the permit condition nearly meaningless. As we read the original permit, it authorizes significant residential development, but sets aside the

Meadow Lot to be preserved for agricultural uses. If residential development is permitted in the Meadow Lot as well, the permit condition serves no purpose.

For similar reasons, we reject SCH's argument that the issue of replacing the barn with a residence was not raised during the original permitting process. SCH's understanding of the issue at stake is unreasonably narrow. The original permit does not specifically address any number of possible uses for the Meadow Lot, from single-family residence to industrial complex to skyscraper. The permit did establish, however, that Criteria 8 and 9(b) required that the Meadow Lot remain as open land preserved for agricultural uses. That condition was *suggested by Stowe Club Associates* and incorporated into the permit, and is binding on SCH unless the permit is amended.

## II.

We turn, then, to considering whether the Board should have granted SCH's application to amend the original permit to allow development of the Meadow Lot. Although Act 250 does not refer to permit amendments, the Board has adopted a rule establishing procedures for applications for permit amendments. Environmental Board Rule 34. The rule provides that "[a]n amendment shall be required for any material or substantial change in a permitted project." *Id.* The rule does not, however, establish standards that guide the Board in evaluating requests to amend existing permits.

In its decision in this case and in an earlier opinion, *In re Cabot Creamery Coop.*, Permit #5W0870-13-EB (Vt. Envtl. Bd. Dec. 23, 1992), the Board has applied the doctrine of collateral estoppel to review proposed permit amendments. The Board relied on our statement in *In re Carrier*, 155 Vt. 152, 157-58, 582 A.2d 110, 113 (1990), that the principles of collateral estoppel generally apply in administrative proceedings, although not as an "inflexible rule of law." Here, the Board applied the five elements of collateral estoppel set out in *Trepanier v. Getting Organized, Inc.*, 155 Vt. 259, 265, 583 A.2d 583, 587 (1990). Concluding that each of the *Trepanier* criteria was satisfied in this case, the Board denied SCH's application.

■ We are not persuaded that collateral estoppel provides the correct framework in which to evaluate applications for permit amendments. The doctrine of collateral estoppel, or issue preclusion, applies when a party seeks to relitigate a factual or legal issue

previously decided in a judicial or administrative proceeding. The effect of collateral estoppel is that resolution of a specific issue, such as a factual dispute or question of law, is given the same preclusive effect as the final judgment of the court or agency. So, if a federal court has ruled against a plaintiff on the merits of an age discrimination claim, the plaintiff may be collaterally estopped from bringing a separate action under state law that turns on the same allegation of age discrimination. See *id.* at 266, 583 A.2d at 588.

In a permit amendment case, however, there is no dispute that the applicant is bound by the provisions of the original permit. Here, the original permit, including Condition 13, governs the development of the Stowe Club tract unless the permit is modified. By applying collateral estoppel, the Board in effect evaluated whether the original permit conditions have the force or effect of a judgment; that analysis is unnecessary because the original permit is a prior judgment that without question binds the parties.

The central question in this case is not whether to give effect to the original permit conditions, but under what circumstances those permit conditions may be modified. Under the permit amendment process set up by the Board, permits are not final and unalterable. A party subject to a permit may seek to amend the conditions, and presumably, the Board will sometimes grant the amendment. To resolve these cases consistently and fairly, the Board must develop a set of standards governing permit amendments. The elements of collateral estoppel, although superficially appealing, cannot substitute for such standards. The doctrine of collateral estoppel is based on the premise that issues previously litigated and resolved on the merits should not be reopened. The Board, however, has explicitly acknowledged in Rule 34 that previously litigated permit conditions in some cases may be revisited.

## III.

We consider it neither appropriate nor necessary in the context of this case to fully explore what standards should guide the Board in evaluating applications for permit amendments. That task belongs, in the first instance, to the Board, which may decide to express those standards through rulemaking rather than through individual decisions. See 3 V.S.A. § 801(b)(9) ("rule" defined as "agency statement of general applicability which implements, interprets, or prescribes law or policy"); 1 K. Davis & R. Pierce, Administrative Law Treatise § 6.7, at 260-66 (3d ed. 1994) (rulemaking procedures generally allow

for greater efficiency and fairness). Here, along with collateral estoppel, the Board addressed certain policy considerations that it considered relevant in deciding whether to grant the permit amendment. The Board's analysis of these issues was appropriate and, in the context of this case, sufficient to support the denial of the permit amendment.

The Board framed its discussion as weighing the competing values of flexibility and finality in the permitting process. If existing permit conditions are no longer the most useful or cost-effective way to lessen the impact of development, the permitting process should be flexible enough to respond to the changed conditions. The Board recognized three kinds of changes that would justify altering a permit condition:

> (a) changes in factual or regulatory circumstances beyond the control of a permittee; (b) changes in the construction or operation of the permittee's project, not reasonably foreseeable at the time the permit was issued; or (c) changes in technology.

The Board concluded that no relevant changes in technology or factual or regulatory circumstances had occurred, and that the changes in the construction and operation of the overall development were reasonably foreseeable.

SCH argues that the Board erred as a matter of law by requiring that changed circumstances be unforeseeable to merit modification of a permit condition. Relying on our decision in *Carrier*, 155 Vt. at 158, 582 A.2d at 113, SCH maintains that any substantial change, whether or not the change was foreseeable, should be grounds to amend a permit condition. Our conclusion in *Carrier*, that "as a general rule, a zoning board or planning commission 'may not entertain a second application concerning the same property after a previous application has been denied, unless a substantial change of conditions ha[s] occurred,'" *id.* (quoting *Silsby v. Allen's Blueberry Freezer, Inc.*, 501 A.2d 1290, 1295 (Me. 1985)), is not relevant here. In that case, we evaluated the application of collateral estoppel to proceedings before a planning commission. As we have already discussed, collateral estoppel is not the proper framework for this case. Moreover, the standards that govern a planning commission's consideration of a second application for a project after it denies the first application are not helpful in determining whether the Board should allow changes to an existing Act 250 permit.

We agree with the Board that the foreseeability of the changes to the Stowe Club project is relevant to the evaluation of the application for a permit amendment. Rarely will a large-scale development such as Stowe Club progress exactly as planned. Contracts often fall through and financial or other restraints may require some parts of a project to be eliminated or downsized. In this sense, foreseeability is related to the degree of change; while small or moderate changes are expected and even common, extreme changes will likely come as a surprise to all involved. Permit applicants should consider foreseeable changes in the project during the permitting process, and not suggest conditions that they would consider unacceptable should the project change slightly. Otherwise, the initial permitting process would be merely a prologue to continued applications for permit amendments.

SCH also argues that the Board erred by concluding that the changes to the project were foreseeable. Specifically, SCH claims that the following changes were unforeseeable: (1) the planned sale of the Meadow Lot to Percy did not occur; (2) the Meadow Lot now serves as a community leachfield, and if limited to agricultural uses is suitable only as pasture and hay land; (3) the number of residential units was decreased slightly; and (4) the hotel plans were changed from a 100-unit hotel and conference center to a 21-unit facility. SCH does not, however, explain why those relatively minor changes were not reasonably foreseeable. SCH's predecessor must have realized that some real estate contracts would not be consummated. At the time the original permit was issued, the Meadow Lot was used only for hay, and there is no suggestion that a different agricultural use, such as planting crops, was expected. The smaller numbers of residential units and hotel rooms are differences of degree, not kind. Despite SCH's claims, not every deviation from a plan is unforeseeable. The Board was justified in finding that the changes to the Stowe Club project were foreseeable.

Next, the Board considered the need for finality in the permitting process. The Board recognized that parties and other interested persons rely on permit conditions designed to mitigate the impact of proposed developments. In this case, the Board found that purchasers of adjacent residential lots relied upon the permit condition restricting development of the Meadow Lot when they chose to live in the neighborhood. The Board also noted that the District Commission relied upon the representations of Stowe Club Associates, using the permit condition as one aspect of a mitigation plan for the overall development.

SCH maintains that the Board erred by considering any reliance by adjacent landowners, because the permit condition is not a real covenant and cannot be enforced by the other landowners. This hypertechnical argument obscures the basic concern: whether allowing the permit amendment is appropriate under the circumstances. The standing of the adjoining landowners to enforce the existing permit is not relevant to whether the Board should grant the permit amendment.

We are similarly unpersuaded by SCH's claim that the Board improperly emphasized the representations made by Stowe Club Associates in the original permit application. This case is easily distinguished from our decision in *In re Kostenblatt*, 161 Vt. 292, 299, 640 A.2d 39, 44 (1994), where we held that representations made to a zoning board could not be enforced unless they were expressly incorporated into the permit. The representations of Stowe Club Associates were incorporated into the permit, through Conditions 1 and 13; the Board did not attempt to enforce any unwritten conditions. The Board simply considered two facts: first, that the restriction on the Meadow Lot was suggested by the original applicant, and second, that the District Commission used the permit condition as part of a plan to mitigate the impact of the development as a whole. As the Board was evaluating the District Commission's reliance on the permit condition, these facts were a proper part of the Board's inquiry.

The reasonable reliance of the District Commission and the neighboring landowners weighs strongly against granting the permit amendment. This is particularly true because it appears that SCH and its predecessors benefitted from that reliance: first, when the District Commission issued the original permit, and later, when persons such as Detora purchased lots around the perimeter of the Meadow Lot. None of the other issues considered by the Board or raised by SCH overcomes the reliance of the neighboring landowners and the District Commission. On these facts, the Board was justified in denying SCH's application for a permit amendment.

*Affirmed.*