**STATE OF VERMONT**
**ENVIRONMENTAL COURT**

|                                          |   |                           |
|------------------------------------------|---|---------------------------|
| In re: Deerfield Valley Transit          | } | Docket No. 177-7-06 Vtec  |
|     Association Warming Hut | } |                           |

## Merits Decision

The Deerfield Valley Transit Association (DVTA) operates a public bus service throughout the southern portion of Windham County, commonly known as the "MOOver" bus service. DVTA[1] appealed from the denial by the Town of Dover Development Review Board ("DRB") of its application to expand a pre-existing bus driver warming hut located in the base area of the Mount Snow Resort. The trial of this de novo appeal was conducted on February 8, 2007 at the Windham Superior Courthouse and was preceded by a site visit.

DVTA was represented at the site visit and trial by its General Manager, Randy Shoemaker, and its legal counsel, Thomas J. Montemagni, Esq.[2] The Town of Dover ("Town") appeared through Bruce Wyman[3] and its legal counsel, Will Baker, Esq. No other parties appeared in this appeal or at trial.

Based upon the parties' joint stipulation of undisputed facts and the evidence admitted at trial, including evidence put into context by the site visit, the Court makes the following Findings of Fact and Conclusions of Law:

## Findings

1. DVTA's MOOver bus service has been in operation since 1996. While it and a predecessor bus service first operated only in West Dover to service developments adjoining the Mount Snow Resort, the MOOver has consistently expanded its service and now serves portions of the southern Windham County communities of East and West Dover, Wilmington, Wardsboro, West Wardsboro, Whitingham, Readsboro, Jacksonville, Marlboro and Brattleboro. See Exhibit 9, the MOOver 2006-07 Winter Route Map & Schedule.

---

[1] The pending application was submitted by DVTA as the Applicant and Mount Snow, LTD., as the property owner. Only DVTA filed an appeal with this Court.

[2] Mr. Montemagni also serves as general counsel for Mount Snow LTD., although he did not appear in that capacity in this appeal.

[3] Mr. Wyman is the DRB Chairman and past Chairman of the Town Selectboard.

2.     Riders are not charged a fee for the MOOver bus service.  DVTA receives state and federal grants and private contributions to operate its MOOver bus service.

3.     DVTA has shelters at some of the bus stops along its routes, so members of the general public may shield themselves from the elements while waiting for a MOOver bus.

4.     DVTA also maintains a "warming hut" for the exclusive use by its drivers; members of the general public are not allowed to enter the warming hut.  The warming hut that is the subject of this appeal is located at the "drop off zone" area of the Mount Snow Resort.

5.     DVTA parks and services its buses at a separate facility in Wilmington, known as the former "barn board complex" off of Route 9 in Wilmington, Vermont.

6.     DVTA also maintains an administrative office in the North Commercial Complex along Route 100 in West Dover.  No buses are stored or parked at this facility; a MOOver bus stop is adjacent to the North Complex.  DVTA's General Manager sometimes operates out of these administrative offices, but is also often called to various places along the MOOver bus routes, including the Mount Snow bus stop.

7.     Mount Snow LTD. ("Mt. Snow"), the owner and operator of the Mount Snow Resort, and DVTA first proposed a MOOver warming hut in the base area of Mount Snow in 1997.  This initial structure measured just seven feet by seven feet (for a total of forty-nine square feet).  Neither Mt. Snow nor DVTA obtained a permit for this initial structure.[4]

8.     On June 1, 2004, Mt. Snow and DVTA applied for authorization to expand the existing warming hut so that its footprint would measure 7' by 17', for a total of 119 square feet.  Because the Mount Snow Resort property was already the subject of a planned unit development (PUD) permit, this application took on the form of an amendment to the pre-existing PUD permit.  The DRB approved the PUD amendment on July 27, 2004.

9.     The July 27, 2004 DRB Decision (Exhibit C) reflects DVTA representations that the warming hut would be used only by bus drivers, sometimes as many as twelve at a time, "to sit and eat or have a cup of coffee or to talk amongst themselves [and] to get them out of the buses."  Exh. C at 1.  There would be a counter and several stools in the expanded warming hut.  There would also be a heater in the expanded warming hut, but no other facilities were then planned.

10.     The warming hut was expanded as contemplated by the 2004 DRB approval.

---

[4] DVTA asserts that its first Mount Snow warming hut was an accessory building for which a permit is not required. See Dover Zoning Bylaws § 215(2).  The Town disputes this legal contention.

11. The Mt. Snow warming hut is adjacent to several public bus shelters made available to individuals while they wait for their bus to arrive. This area and the temporary parking area that adjoins it are referred to as the "drop off zone" at Mt. Snow.

12. To serve its twelve bus routes, DVTA operates up to twenty-one buses during its busiest season, which coincides with the skiing season. Of the buses in operation during the skiing season, about ten buses cycle through the Mt. Snow base area.

13. The MOOver bus routes have been increased over their years of operation. Pursuant to federal and state regulations, the routes and individual stops along the routes are specifically detailed and must be adhered to by the MOOver drivers. The buses are not dispatched to pick up individual riders at a place of the rider's choosing; riders wishing to use the MOOver must wait at one of the designated bus stops for the MOOver bus to arrive at the posted time and place. As such, there is no "dispatching" of buses. Rather, bus drivers and the DVTA General Manager keep in contact with each other through two-way radios, to determine if buses are running on time or are broken down, delayed or otherwise deviating from the established schedule. When these unexpected breakdowns or deviations occur, other drivers and buses are sent out as needed to maintain the posted bus service.

14. The Mt. Snow and Deerfield Valley Health Center hubs operate as connection centers for the various bus routes; they each serve as a central location at which buses from several routes arrive. The hubs allow bus passengers to change onto a different bus, so that they can continue on to their final destination. The DVTA's use of multiple bus routes and the two central hubs allows buses to arrive and depart frequently, so as to minimize the time that riders must wait for buses and the time that buses sit idling at one location.

15. The area in which the Mt. Snow warming hut and bus shelters are located is restricted to pedestrians and MOOver buses; no other vehicles are allowed in the area. This area is adjacent to several of the numerous parking areas that serve Mt. Snow visitors. To the east of the MOOver drop-off/pick-up area is a temporary parking area used by Mt. Snow visitors to drop off or pick up people and ski and snowboard equipment from private vehicles. This general area operates as a multi-modal connection area where Mt. Snow visitors can park and pick up or drop off individuals using the MOOver or accessing the Mt. Snow base area facilities.

16. The DVTA General Manager and MOOver drivers stay in communication with each other via hand-held radios. This practice has been in effect for many years. The DTVA drivers

and staff use these radios to coordinate the arrival and departure of MOOver buses from the Mt. Snow and Deerfield Valley Health Center hubs.

17.     On May 2, 2006, Mt. Snow and DVTA applied for authorization to further expand the existing warming hut to add eight feet to its width, so that its new footprint would measure 15' by 17', for a total of 255 square feet. This represents a 136 square foot expansion from the existing structure.

18.     The expanded warming hut would continue to be used by bus drivers only, who wished to converse with each other, have a cup of coffee or eat their lunch while not on their designated bus routes. There would also be a phone[5] and radio in the expanded warming hut for drivers and other DVTA staff to use when conversing with each other and coordinating their bus routes.

19.     The expanded warming hut would also house a self-contained portable toilet, commonly known as a "porta-potty", and sink for hand washing, solely for use by the bus drivers. This represents an expansion of the warming hut's present use. Up to the current time, MOOver bus drivers needing to use bathroom facilities would walk to the Mt. Snow Base Lodge, the "Clock Tower" building or Mt. Snow Academy facilities.

20.     The porta-potty and sink will be fully enclosed within a portion of the addition to the warming hut. The porta-potty will be cleaned and serviced on a weekly basis during the busy winter months by an outside contractor; it would be cleaned less often during the slower months. DVTA offered to arrange to have the porta-potty cleaned on a more frequent basis, if needed to eliminate offensive odors.

21.     In the expanded warming hut, the DVTA also proposes to install an additional table and stools, a bench, a fixed (as opposed to hand held) radio, a closet and storage space for a small quantity (i.e., no more than a couple of gallons) of windshield washer fluid and a couple quarts of engine motor oil, both to be used in the MOOver buses. MOOver drivers may also be allowed to change clothes and store a small quantity of personal items in a closet that would be constructed in the expanded warming hut.

22.     DVTA claims that the proposed larger warming hut is needed because of the popularity of MOOver routes and the rigid nature of those route schedules. Because the MOOver is

---

[5] It appears from the evidence provided at trial that the warming hut already had a telephone for use by its drivers, although the 2004 DRB Decision does not specifically authorize such use.

partially funded by federal and state grants, DVTA's ability to make changes to the approved bus routes is restricted.

23.    The proposed expansion would be along the south side of the warming hut.  This side of the building abuts skier parking.  The proposed eight foot expansion will not reduce the number of available parking spaces or interfere with the flow of vehicle or pedestrian traffic in the adjoining parking lots or through the drop zone area.

24.    The Mt. Snow MOOver warming hut is located in the H-1 Zoning District.

## Discussion

The pending application seeks an amendment to the pre-existing PUD permit that governs the entire Mount Snow Resort base area.  Thankfully, we are not required to review all aspects of the Mount Snow PUD permit, but only those aspects that are impacted by the proposed MOOver warming hut expansion.

This is a de novo appeal, as the Town has chosen not to adopt the administrative procedures of 24 V.S.A. § 4471(b).  In hearing de novo appeals, this Court "'has the duty to enforce, and the power to condition or waive, the zoning regulations in the same manner as the Zoning Board of Adjustment [, the DRB] or the Planning Commission.'"  In re Torres, 154 Vt. 233, 235 (1990) (quoting In re Poole, 136 Vt. 242, 247 (1978)).  "The reach of the . . . court in zoning appeals is as broad as the powers" of the appropriate municipal panel below, but the Court's power is also as limited as that of the panel below.  Torres, 154 Vt. at 235.  In that light, we proceed with our review of the issues preserved in this appeal in the same manner and with the same authority as the DRB below.

The pending application seeks to increase the existing warming hut by 136 square feet. While this will more than double the size of this building, it will remain a relatively tiny structure.  With the exception of the potential for offensive odor from the porta-potty, which we discuss below, the most credible evidence is that this expansion will not interfere with the vehicle or pedestrian traffic in the Mt. Snow drop off zone.

It also appears undisputed from the evidence presented that the MOOver is ancillary to the Mt. Snow Resort.  Many of Vermont's major ski resorts are served by public transportation systems.  Some public transportation systems were established to mitigate traffic congestion surrounding these resorts; some were mandated by state or municipal land use permits issued in connection with major resort expansions.  The circumstances surrounding the impetus for

establishing the DVTA MOOver were not made expressly clear by the evidence presented here, but it appears beyond dispute that the DVTA MOOver bus service is ancillary to the Mt. Snow Resort. Stated differently, if the Mt. Snow Resort did not exist, it appears unlikely that the MOOver would exist, especially at the intensity of use as now occurs during the ski season.

Our above analysis resolves the first issue remaining in DVTA's Statement of Questions:[6] the expanded warming hut is an accessory structure and use because it is incidental to the primary use of the property, is directly related to that use, and therefore is allowed in the H-1 Zoning District pursuant to the Town of Dover Zoning Bylaws ("Bylaws") § 355.[7]

Of the remaining two Questions, it appears that the disputed factual and legal issues revolve around the appropriateness of (1) the proposed porta-potty in the expanded warming hut; (2) the installation of a fixed radio for communication with drivers; and (2) the general expansion of size and uses in the warming hut. We therefore turn our review to these disputed issues and the applicable provisions of the Bylaws.

## 1. **The Porta-Potty.**

DVTA drivers work long hours; their shifts sometimes run twelve hours. Because of their route schedules, drivers sometimes only have breaks of a few minutes between routes. In light of the circumstances under which these drivers work, we understand why DVTA proposes to install bathroom facilities within the expanded warming hut. We are next left to determine whether the proposed porta-potty should be permitted here.

The primary objection the Town offers to the use of a porta-potty in the expanded warming hut is the potential for noxious odors, such as those that sometimes emanate from such facilities. The Town also notes that while it has previously permitted the use of porta-potties, including on the Mt. Snow Resort property, all prior uses have been on a temporary basis only. DVTA's application represents the first time a porta-potty has been proposed as a permanent facility under these Bylaws.

Before turning to the applicable provisions of the Bylaws, we first note that the evidence presented on this point is not directly contradictory, but rather just different. DVTA asserts that

---

[6] That being Question #2 in DVTA's Statement of Questions filed August 28, 2006. Question #1 was withdrawn, as noted in the Entry Order dated October 16, 2006.

[7] An "accessory use or structure" is defined in Article 10 of the Bylaws as "[a] use or building which is incidental, separate or subordinate to the primary use or building of a lot or parcel of land, is located on the same lot as the primary use or building, and is clearly related to the primary use or building."

the cleaning procedures they propose for this specific porta-potty will eliminate the potential for any odor, particularly a noxious odor, from the area surrounding the expanded warming hut. The Town's concerns stem from the common, well founded perception that porta-potties generally smell, together with an additional concern that skiers and other members of the general public will be enticed into the warming hut to use the porta-potty, thereby increasing its potential for overuse and noxious odors. We conclude that DVTA's cleaning procedures will be reasonably adequate to protect against odors emanating from the porta-potty, subject to the conditions expressed below that we believe will ensure that its use will be restricted to DVTA employees only.

Uses that are "or may be injurious, noxious or offensive" are prohibited in any Town zoning district. Bylaws § 592. For the reasons stated above, and subject to the conditions noted below, we conclude that the porta-potty proposed by DVTA does not run afoul of Bylaws § 592.

Planned unit developments are allowed in Dover "to encourage flexibility of design and development of land [in] such a manner as to promote the most appropriate use of land . . . ." Bylaws § 605. PUD applications must conform to the general development standards contained in Bylaws § 620. The DRB in the first instance, or this Court on appeal, is authorized to impose conditions on a proposed PUD in connection with its approval. Bylaws § 625. For the reasons more specifically stated above, we conclude that the proposed expansion of the warming hut and its associated uses are ancillary to the primary development in the Mt. Snow Resort. Subject to the conditions noted at the end of this Decision, the PUD amendment is authorized by Bylaws §§ 620 and 625.

The Town contends that the pending amendment application runs afoul of the finality doctrines that this Court must respect. See 24 V.S.A. § 4472; see also In re Hildebrand, Docket No. 228-12-04 Vtec, slip op. at 501 (Vt. Envtl. Ct., October 13, 2005), aff'd 2007 VT 5. We disagree. The finality doctrine this Court relied upon in Hildebrand, as adopted from the Act 250 appeal controlled by In re Stowe Club Highlands, 166 Vt. 33 (1996), was not absolute; it balances the need for finality that must follow from final land use determinations with the need for flexibility, particularly when changes in law or circumstances so warrant.

But as we noted in Hildebrand, not all permit amendments trigger a Stowe Club analysis. Docket No. 228-12-04 Vtec, slip op. at 501-02. Rather, only amendments that attempt to change prior permit conditions must satisfy the Stowe Club test. Here, we find no condition in the 2004

permit authorizing the existing warming hut that DVTA is now attempting to eliminate.[8]  We therefore conclude that a Stowe Club analysis is not necessary here.

## 2.      Radios and "Dispatching."

DVTA has long had an established practice of its drivers and General Manager staying in constant contact with each other through the use of portable radios.  This is a common practice these days of entities that have many employees operating in various locations.  One need go no farther than the various departments at the Mt. Snow Resort to find examples of the frequent use of hand held radios in the course of a department's operation.  Such use cannot be classified as "dispatching" services.

It is unclear from the evidence presented at trial where the term "dispatching" originated.  The DVTA General Manager may have been the first to use it in his presentation to the DRB, a use that we could now see him regretting.  None-the-less, we have before us the actual use proposed and need not rely upon the generalized understanding of the term "dispatching."

No single employee is proposed to be a "bus dispatcher," operating out of the Mt. Snow warming hut.  Rather, the radio proposed to be located in the expanded warming hut is to be used by the various drivers and the General Manager as they visit the warming hut and determine whether the MOOver buses are operating on schedule.  We see little difference between the handheld radios used on the individual buses and the proposed warming hut radio.  In short, we do not see this as an expansion of the warming hut use; we understand it to be a continuation of the use of radios by MOOver drivers, including drivers in the Mt. Snow drop off zone area.  To assure that our understanding is accurate, we will include a condition that the type of intensive dispatching use that concerns the Town does not occur at the expanded MOOver warming hut.

## 3.      General Expansion Concerns.

Lastly, the Town expresses concerns about the general expansion of the DVTA facilities in the Mt. Snow drop off zone area.  While it is true that the proposed expansion will more than double the size of the warming hut, the expansion only represents a 136 square foot increase in

---

[8]  The Town notes that in connection with the 2004 permit amendment, DVTA represented that no "sewage" facilities were planned at that time.  There is no evidence that the DRB conditioned its 2004 approval on the absence of sewage facilities.  To do so here would be akin to holding a homeowner to his original representation that his home would only contain one bathroom, thereby prohibiting further expansion.  In the absence of a specific permit condition upon which the approval of the existing permit depended, we decline to employ such a draconian interpretation of Stowe Club.

the size of the warming hut. When this expansion is compared to the total development encompassed by this PUD, we conclude that the proposed expansion is minor in nature.

In fact, the expansion of the DVTA facilities will more likely benefit the efficient flow of pedestrians and vehicles that come to visit the Mt. Snow Resort; the expanded warming hut will help the MOOver minimize the burden this PUD resort places upon transportation networks, thereby furthering the goals of Bylaws § 620(E).

For all of these reasons, we conclude that, with the appropriate conditions, the proposed expansion will not generate an undue burden upon the existing PUD development facilities or the municipality generally and is thus in conformance with the general development standards for PUDs contained in Bylaws § 620.

## **Conclusion**

For the above reasons, we conclude that DVTA's application for an amendment to the existing Mt. Snow PUD Permit to allow for the expansion of its bus driver warming hut is in conformance with the applicable Bylaws and should therefore be **GRANTED**, subject to the following conditions:

1. The enclosed porta-potty shall not be visible from outside of the warming hut; it shall be shielded, if necessary, so as to conceal it from view of the general public. Signs shall be posted on the outside doors of the warming hut and on the front of the porta-potty stating that the warming hut and facilities within it are "For Employees Only".

2. The porta-potty and self-contained sink shall be regularly cleaned by a person competent to service such facilities, on an as-needed basis so as to protect against odor emanating into or from the warming hut. If odors do emanate from the warming hut, DVTA shall increase the cleaning schedule as needed to eliminate such odor. Failure to eliminate such odors may be grounds for enforcement or permit revocation proceedings.

3. Use of the warming hut shall be limited to DVTA bus drivers and its General Manager. Members of the general public shall be restricted from using the warming hut.

4. The radio to be installed in the warming hut shall only be used by DVTA bus drivers and its General Manager. In the event DVTA has an employee, now or in the future, whose job responsibilities are for the most part devoted to radio dispatching services, that employee may not operate out of the Mt. Snow warming hut.

This completes the current proceedings in this appeal before this Court; the matter is now concluded.    This matter is remanded to the Town Zoning Administrator to perform the ministerial act of issuing a permit in conformance with this Decision.

A Judgment Order accompanies this Decision.

Done at Berlin, Vermont this 5th day of April, 2007.


_____
Thomas S. Durkin, Environmental Judge