STATE OF VERMONT

ENVIRONMENTAL COURT

|  | } |  |
| --- | --- | --- |
| In re: Hartland Group, 237 North Ave. Project | } | Docket No. 120-6-05 Vtec |
| (Appeal of Bjerke, <u>et al.</u>) | } | |
|  | } | |

Decision and Order

Appellants Alan Bjerke, Valerie Hockert-Lotz, Edward Winant, Annelein Beukenkamp-Winant, James Bumpas and Molly Bumpas appealed from the decision of the Development Review Board (DRB) of the City of Burlington, granting Appellee-Applicant Hartland Group, LLC's application for approval of a project consisting of twenty-five condominiums and a restaurant-café at 237 North Avenue. Appellants are represented by Paul S. Gillies, Esq. and Appellant Alan A. Bjerke, Esq.; Appellee-Applicant is represented by Brian Dunkiel, Esq. and Ronald A. Shems, Esq.; and the City is represented by Kimberlee J. Sturtevant, Esq.

Certain issues in this appeal were resolved on summary judgment.[1] An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge, and a site visit was taken with the parties and their representatives. The parties were given the opportunity to submit written memoranda and requests for findings. Upon consideration

---

[1] The decision and order on summary judgment issued in this matter on December 14, 2006, is hereby incorporated in this decision and will not be repeated except as necessary for clarity in this decision. As agreed by the parties at trial and reflected in their post-trial filings, the issues remaining for trial after the resolution of the summary judgment motion were Question 4 relating to the number of parking spaces required for the proposed café, waiver of a loading space, and waiver of parking spaces; Question 5, which contained subsections (a) through (e); Questions 6(a) and 6(b); and Question 9. Question 9 was resolved on the record on the first day of trial.

of the evidence as illustrated by the site visit, and of the written memoranda and requests for findings filed by the parties, the Court finds and concludes as follows.

Appellee-Applicant proposes to redevelop an existing .65-acre parcel[2] of property, currently improved with an existing 16,500 square-foot commercial (warehouse) building, at 237 North Avenue. The building was originally in use as an automobile showroom and dealership. Appellee-Applicant proposes a twenty-five-unit condominium complex and a forty-seat restaurant-café. Appellee-Applicant's parcel is located at the intersection of North Avenue and Berry Street in a Residential Medium-Density zoning district in the City's "Old North End" neighborhood.

As more fully described and analyzed in the Decision and Order on summary judgment, the commercial warehouse use of the building is nonconforming but holds a valid permit. The proposed residential use is a conforming use in the district; the café is analyzed as a change of a preexisting nonconforming commercial warehouse use under §5.1.8. The café use proposed for the portion of the building fronting on North Avenue will be less harmful or detrimental to the neighborhood than the warehouse use as it is entitled to operate under its existing permit.

The project property is roughly rectangular, with the shorter dimension facing the west side of North Avenue. The next street intersecting with the west side of North Avenue to the north of Berry Street is Sunset Court. The northerly lot line of the project parcel is bordered by three residential lots having frontage on Sunset Court.

---

[2] The parcel as a whole encompasses an additional 0.05 acre strip of land on the westerly end of the original parcel (at the top of the cliff), purchased from the City in September 2004. However, a condition of the deed states that the additional parcel "will not be used to calculate allowable density, setbacks or lot coverage to meet zoning requirements for the development" of the original 0.65-acre lot. Accordingly, the calculations regarding density, setbacks and lot coverage in this case have been based upon the 0.65-acre lot size rather than the full 0.7-acre lot size.

The southerly lot line of the project parcel runs approximately along the northerly side of Berry Street to the westerly side of the intersection of Berry Street with Lakeview Terrace, where it makes an approximate two-foot jog to the north, and continues towards the west along the northerly side lot line of Appellants Hockert-Lotz and Bjerke's property. The parcel's westerly lot line runs at an angle along the top of the cliff above the adjacent city-owned property.

Question 6(a) - Major Impact Development criterion §13.1.6(d) (soil erosion or reduction in the capacity of the land to hold water)

Appellee-Applicant has argued that the criterion in the Zoning Ordinance regarding soil erosion and the soil's capacity to hold water is sufficiently similar to criterion 4 of Act 250 so that the positive conclusion in the unappealed Act 250 permit on soil erosion and the soil's capacity to hold water should conclude this issue in this Court, based on principles of issue preclusion. Trepanier v. Getting Organized, Inc., 155 Vt. 259, 265 (1990); In re Stowe Club Highlands, 166 Vt. 33, 36-37 (1996). It is unnecessary to analyze all the criteria for applying issue preclusion in the present case, and especially "the legal standards and burdens employed in each action" and "the procedural opportunities available in each forum." Trepanier, 155 Vt. at 265. Rather, the better practice in the present context is to reach the merits of the issue so that this Court's conclusions are clear, based on the evidence presented in this proceeding.

For the purposes of determining runoff, the existing parking area acts as impervious surface even though is partly paved and partly of compacted gravel. Therefore, the impervious surface is not increased even though a greater proportion of the property will be covered with the building. Under current conditions, stormwater runs off the property uncontrolled.

The project proposes to collect stormwater falling on the building by conducting it

3

to roof drains and thence to stormwater detention tanks to be located below the floor slab of the parking garage. The tanks will be equipped with access for cleaning. Oil will be separated from the stormwater and the stormwater will be controlled by a slow-release orifice to provide twelve to twenty-four hours of detention time to minimize the effect of a storm on the City's stormwater system. The project proposes to conduct stormwater falling on the westerly grassed area and ground-level patios to a shallow sedimentation basin located at the westerly end of the property. The proposed stormwater system will reduce the risk of soil erosion and other stormwater pollution after construction. In addition, the erosion prevention and sediment control plan proposed to be followed during construction will prevent unreasonable soil erosion during construction. The capacity of the land to hold water will be improved by the sedimentation tank system and the sedimentation basin. The proposal therefore meets §13.1.6(d) of the Zoning Ordinance.

Question 6(b) - Major Impact Development criterion §13.1.6(e) (unreasonable congestion or unsafe conditions with respect to use of the highways) and Question 5 - Design Review criterion § 6.1.10(d) as to traffic

Appellee-Applicant has argued that the traffic criteria in the Zoning Ordinance are sufficiently similar to criterion 5 of Act 250 so that the positive conclusion in the unappealed Act 250 permit on traffic should conclude the issue in this Court, based on principles of issue preclusion. For the same reasons as with regard to Question 6(a), the Court will reach the merits of the issue based on the evidence presented in the present case.

The proposed residential use will generate approximately eleven to thirteen one-way vehicle trips in the morning and afternoon peak hours or one vehicle trip every five minutes. Unlike the former commercial warehouse, the proposed residential and café uses will not generate any tractor-trailer use on Berry Street or on Lakeview Terrace. Deliveries to the café will be by service vehicles which will park on North Avenue.

4

Although approximately half of the patrons of the café are expected to walk or bicycle rather than to drive to the café, the traffic analysis was performed as if all patrons would drive to the café. Using that assumption, and using local data from a café on a street with similar characteristics on the south side of Burlington, the café is expected to generate approximately 76 one-way trips (46 arriving and 30 departing) in the morning or the Saturday peak hour,[3] and is expected to generate 17 one-way trips (11 arriving and 6 departing) in the afternoon peak hour. Approximately 75% of the morning trips and 50% of the Saturday trips would be so-called "pass-by" trips, that is, vehicles that would be on North Avenue anyway but would stop and park to visit the café. These pass-by trips would not generate any additional traffic on North Avenue although they could still have an effect on the traffic due to the parking maneuvers of those vehicles. The peak hour trip generation of the former permitted warehouse use was 22 one-way trips (19 arriving and 3 departing) in the morning peak hour and 22 one-way trips (10 arriving and 12 departing) in the afternoon peak hour.

Based on the traffic analysis in evidence, the minor additional traffic generated by the proposal over that generated by the former permitted warehouse use will not adversely affect the substantial volume of traffic already traveling on North Avenue, and will not change the levels of service for any of the directions of use of the intersection at North Avenue and Berry Street.

North Avenue to the north of Washington Street and the project location is a relatively wide and open roadway, passing by several large open properties with

---

[3] The morning peak hour for traffic (approximately 1000 vehicles) on North Avenue at this location is from 7:15 to 8:15 a.m., 70% of which is southbound. The afternoon peak hour (approximately 1200 vehicles) is from 4:30 to 5:30 p.m, 59% of which is northbound. The Saturday peak hour (approximately 950 vehicles) is from 11:45 a.m. to 12:45 p.m., 54% of which is southbound.

institutional uses, owned by the Archdiocese of Burlington, before reaching the more built-up area beginning three houses north of Sunset Court. Drivers traveling southbound on North Avenue often drive towards Burlington at a relatively high rate of speed appropriate to a more suburban location. Currently, the segment of North Avenue extending from Washington Street to North Street is a high-accident location, primarily in the southbound lane and primarily due to southbound drivers' lack of attention to conditions when approaching the more built-up area, which features increased congestion, slower traffic, and more turning maneuvers.

Appellee-Applicant proposes to install several so-called bulb-outs to serve as traffic-calming measures. These are areas in which the sidewalk is enlarged with curbing into the street, and in which street trees are proposed to be planted. The street trees will not have foliage below a height of ninety-six inches, so that they will not impair visibility.

Two bulb-outs are proposed to be installed on the west side of North Avenue, one across from Convent Square (to the north of the project property) and one on the corner of North Avenue and Berry Street; the remaining one is proposed to be installed on Berry Street near the corner of North Avenue. The bicycle lane on the west side of North Avenue will end at the more northerly bulb-out; a bicycle lane also is located on the east side of North Avenue. The more northerly bulb-out will also protect the parking spaces on the west side of North Avenue southerly from that point.

From the point of view of traffic safety, the bulb-outs will narrow the roadway and provide a clear visual cue to southbound drivers that they are approaching a more built-up area and need to slow down and be more alert to vehicle slowing and turning movements, as well as to pedestrians and cyclists. The bulb-out at the North Avenue/Berry Street intersection serves the additional function of allowing drivers exiting Berry Street to 'nose out' safely farther into the North Avenue right-of-way to have better visibility of oncoming North Avenue traffic for making turning maneuvers. The installation of the bulb-outs will

6

therefore make conditions safer with respect to traffic on the adjoining roadway and will not create undue congestion.

The proposal therefore meets §13.1.6(e) and §6.1.10(d) of the Zoning Ordinance.

Question 5 - Design Review Criteria § 6.1.10(a) (b), (c) and (j) (other than traffic and parking[4])

Design Review Criterion § 6.1.10(a) - Relate development to its environment

As more fully described in the summary judgment decision, the original building, when in use as an automobile dealership and repair facility, had large display windows for the showroom facing North Avenue; the windows have been bricked in since the prior use of the building for a printing business. The present application proposes to restore the front part of the building, facing North Avenue, to the appearance of the original automobile showroom facade, restoring its windows, and to convert that space for the café use, with the interior space designed to resemble the style of the showroom.

The application proposes to expand the building's footprint towards the west, and to convert the property's use to a mixed-use building containing twenty-five residential condominiums and an associated garage, as well as the café. The resulting building is designed to have a ground floor that fills the footprint of the building; above that level it is designed with three separate three-story segments, each having two stories above the ground floor. The resulting proposal has the appearance and mass of three smaller buildings above the ground floor. The ground floor contains the parking garage in the central portion of the building, including room for household storage units assigned to the residential units, for bicycle racks, and for the garbage storage for the building. An

---

[4] As to traffic, Question 5(d) (relating to site plan criterion 6.1.10(d)) is addressed with Question 6(b), above; as to parking, it is addressed with Question 4, below.

elevator for the central portion of the building is accessible from the garage and from a pedestrian entrance from Berry Street. Vehicular access to the garage is from Berry Street, much closer to North Avenue than the current access to the rear parking lot for the existing building. On the ground floor of the westerly end of the proposed building, three single-story condominium units are proposed, with ground floor patios facing west towards Lake Champlain, and lawn areas landscaped with trees at the westernmost portion of the property.

Above the ground floor, the three separate building segments contain the twenty-two remaining condominium units. The eastern building segment, above the café, will contain four two-bedroom condominium units on the second floor and three two-bedroom units on the third floor, and will not have roof terraces.

The middle building segment, above the garage, is set back considerably from the northerly side of the ground floor, to minimize its visibility from and to the neighboring properties to the north. It will contain eight two-bedroom condominium units, four on the second floor and four on the third floor. In addition, the windows on the north side of the building have been designed and placed relatively high on the walls so as to minimize any visibility of the neighboring property to the north from those units.

The western building segment will contain six two-bedroom condominium units over the three ground floor units: three on the second floor and three on the third floor, as well as one two-story, two-bedroom condominium unit on the second and third floors over the southwesterly corner of the garage, facing Berry Street. A second Berry Street pedestrian entrance to the building, near the intersection of Berry Street with Lakeview Terrace, provides access for the western residential units, and a second elevator provides access to the units on the upper floors. Roof-top terraces are proposed at the southern or Berry Street end of the central building, over the two-story unit at the southern side of the western building overlooking the intersection of Berry Street with Lakeview Terrace, and

8

over the three westerly units. The central building has been designed so that no roof-top terraces overlook the houses to the north on Sunset Court.

As well as installing complying exterior lighting on the building, the project proposes to replace outdated street light fixtures along Berry Street with modern street light designed and in locations so as to reduce glare on neighboring properties on Berry Street. Slatted ventilation openings within the garage have been designed to minimize the effects of automobile headlights within the garage on any neighboring properties.

The proposed development relates appropriately to its context, which includes multi-family residential, institutional and commercial buildings along both sides of North Avenue, as well as a wide variety of residential buildings along North Avenue, Berry Street, Lakeview Terrace, Washington Street and Convent Square. The area is characterized by a diversity of building styles, materials, heights and roof shapes even among the residential buildings, which are located fairly close together, typical of this older neighborhood within walking distance of downtown Burlington. The visual context includes a large, flat-roofed commercial building just to the north across North Avenue, occupied by a medical equipment and supply business, as well as several institutional buildings set in their own grounds to the north of the project on the same side of North Avenue. Because the proposed project is divided into three masses above the ground floor, is set back from the north side of the ground floor, and is stepped back along its west side, it does not present an inappropriate visual mass.

Therefore, as proposed, the project will meet § 6.1.10(a) of the Zoning Ordinance.


Design Review Criterion § 6.1.10(j) - Consider the microclimate (including noise)

The heating system for the entire building consists of two high-efficiency natural-gas-fired hot water boilers located in the mechanical room next to the café in the northeastern area of the ground floor. Insulated distribution piping distributes the heat to

9

the condominium units and to the café. The heating system is vented to the roof. It has been designed to minimize heat loss and will not appreciably affect the microclimate.

The residential units have been designed to have excellent natural ventilation. While unit owners may opt to install an air conditioning cooling system, they will be prohibited by the condominium bylaws from installing window-mounted air conditioning units. Any owner wishing to install air conditioning may do so only by installing a split-system air conditioner with the condenser portion contained in a small unit mounted centrally on the building's roof. The noise generated by these units is comparable to or less than that generated by window units; however, as they would be mounted on the roof and shielded, any such noise will be less noticeable to the neighbors.

The café kitchen is proposed to be equipped with a hood exhaust system with air filters designed to control odor, also vented to the roof of the easterly building. Food waste produced by the café operation will be stored in a refrigerated unit inside the building until it is removed by a commercial waste handling company three times a week.

Therefore, with the conditions imposed below, the project as proposed will meet §6.1.10(j) of the Zoning Ordinance.

Design Review Criteria § 6.1.10(b) and (c)  - Preserve the landscape and Provide open space

The project does not propose alterations to the generally level topography of the property except to add a small amount of fill at the westerly end of the property. The open lawn at the westerly end of the property will extend westerly of the ground level patios for the three ground-level units at the westerly end of the building.

The existing condition of the property provides very little open space, as that concept is used in the Zoning Ordinance. Although the term "open space" is not defined, the term "landscaped open space" is defined in the Article 30 of the Zoning Ordinance to

10

exclude parking lots or driveways. Similarly, limitations on lot coverage in §5.3.2, et seq. of the Zoning Regulations include both paved and unpaved parking areas in the calculation of lot coverage, and exclude lawns, gardens and unpaved landscaped areas. Because the existing parking lot does not qualify as "open space" under the ordinance, the fact that part of it will be covered by the new building does not created a violation of §6.1.10. Indeed, its formerly nonconforming use as a commercial parking lot will be replaced by a conforming residential use. It is only because the parking lot has not been used recently at the level allowed under the existing permit for the warehouse that the immediate neighbors have been able to enjoy oblique westerly views over portions of the parking lot. The ordinance does not require those views to be preserved in this district, compare §6.1.11(b); the Court is constrained to follow the Zoning Ordinance as it now exists.

The small amount of open space on the North Avenue and Berry Street sides of the building will be preserved and attractively landscaped. The setbacks required in this area reflect its medium-density urban location.

The existing trees along the south side of the parking lot are not well maintained and are largely non-native species, but in the summer months they do provide a green, leafy appearance when viewed from down Lakeview Terrace looking to the north towards the Berry Street intersection. That area is proposed to be landscaped with trees and shrubs along the building and in the curve of the intersection, including a new street tree at the intersection, to provide a similarly green and leafy appearance looking towards the westerly building entrance.

The project proposes planting several trees along the westerly open space area and to provide a more dense hedge of Dark American Arborvitae between the property and that of Appellants Bjerke and Hockert-Lotz.

Four cottonwood trees at the boundary between the project property and Appellant Winants' property to the north are located on the Winant property. This type of tree is fast

growing and has weak wood, reflected in its common name. It deteriorates rapidly after reaching maturity. The two more westerly of these trees on the Winant property do not have significant root development on the project property, as observed during non-invasive testing. They are nearing the end of their useful life; one has sustained structural ice storm damage and the other has developed what the consulting arborist characterized as a "threatening lean." However, they will be protected during construction as the landowner has declined to have them replaced in connection with construction. The two more easterly trees have substantial root systems extending under the existing building slab and turning away from the project property due to this obstruction. These two trees will be protected during construction and, while they would benefit from pruning, they are likely to improve over time due to having more room for their root development as a result of the greater setback of the building in that area.

Therefore, with the condition imposed below, the project as proposed will meet §§6.1.10(b) and (c) of the Zoning Ordinance.

Question 4 - Parking and waivers (§§10.1.19 and 10.1.20), and Question 5 - Design Review Criterion §6.1.10(d) as to efficient and effective circulation

The project proposes an on-site garage under the central part of the building, having thirty parking spaces, nine of which are long spaces designed to accommodate an additional car in tandem.[5] Appellee-Applicant proposes to assign one space to each of the twenty-five condominium units, so that each unit will have an assigned space; nine of the units will have an additional tandem space as an amenity. The five remaining spaces in the garage are discussed below with regard to the café parking. Without waivers, the project

_____

[5] As discussed in the December 14, 2006 summary judgment decision, §10.1.16 of the Zoning Ordinance precludes the additional tandem spaces from being counted as spaces for the purpose of determining compliance with the parking space requirements.

12

would require fifty parking spaces for the residential units; and would require a loading space for the café, and ten[6] parking spaces for the café.

Appellee-Applicant conducted a study of the parking availability within a two-minute walk (500 feet) of the project property and within a four-minute walk (1000 feet) of the project property. On-street parking is available along the west side of North Avenue, along Washington Street and Convent Square, along the north side of Berry Street, and along the east side of Lakeview Terrace. An inventory of fifty-eight parking spaces is available within 500 feet and an inventory of approximately 113 spaces is available within 1000 feet. Occupancy rates were surveyed during the peak periods of 7:00 to 8:15 a.m. and 5:00 to 8:00 p.m. The overall occupancy rate did not exceed 50%, even in the higher-occupancy late-evening hours. An average of 34 unoccupied spaces is available within 500 feet and an average of 72 unoccupied spaces is available within 1000 feet. Lakeview Terrace tended to have a higher occupancy rate, with 35% of its sixteen spaces (within 1000 feet) occupied in the early evening hours, and up to 75% occupied after 7:30 p.m.

Efficient and effective circulation

Circulation of vehicles within the building's garage will be adequate; parking maneuvers were studied using a template of a relatively large-size passenger vehicle. There is sufficient maneuvering room within the garage for vehicles to be able to exit the garage frontwards, giving the drivers ample visibility to turn safely into a traveled lane of Berry Street. The shift of the outlet of the garage farther east along Berry Street (than the

---

[6] Appellants suggest that the café would require more than ten spaces, figured under Table 10-A of the Zoning Ordinance at one space for every four seats plus one space for each 75 square feet of gross floor area intended for patron use but without seats. However, Appellee-Applicant has committed itself to requiring the café owner or operator, whether through a lease document or a deed, to maintain the café at a combined level of seats and floor area to require no more than ten parking spaces.

location of the current exit from the parking lot) reduces the potential for conflict at the Berry Street/Lakeview Terrace intersection. The proposal therefore meets §6.1.10(d) of the Zoning Ordinance as to efficient and effective circulation within and from the property.


Parking spaces for the residential units

Appellant-Applicant seeks a waiver of 50% of the off-street parking spaces that would otherwise be required, as provided by §10.1.19 of the Zoning Ordinance, based on the availability of alternate transportation modes, and based on data regarding the local availability of unoccupied on-street parking spaces. However, although the City's parking policies may have changed since the adoption of §10.1.19, the ordinance has not been amended to allow an applicant to demonstrate that "the regulation is unnecessarily stringent" due to the availability of on-street parking spaces. The terms "shared or dual use" and "unique use times," in the context of the ordinance's minimum off-street parking requirements, see §10.1.8 and Table 10-A, refers to the shared use of off-street spaces, for example by several businesses in a single building, or the use of the same off-street spaces for a daytime office use and for an evening restaurant use. In the present case, the project does not propose shared or dual use of off-street spaces, except for the two spaces in the garage available for condominium visitors when the café is closed.

The project location is relatively close to downtown Burlington and has excellent access to alternate transportation modes. Three CCTA bus stops are located within 500 feet, with one southbound stop within 100 feet. A bicycle lane is located on both sides of North Avenue to the north, and on the other side of North Avenue to the south, with access to the Burlington Bicycle Path. The area is served by pedestrian sidewalks south into downtown Burlington. Due to the availability of alternate modes of transportation and the project's proximity to downtown commercial uses and employment, an unusually high percentage (28%) of the existing population of this census tract does not use a vehicle for

14

commuting to work, but instead either walks, bicycles, or travels by bus. Vehicle ownership is also low in this district, with households of one to two people (as are anticipated for this project) having 1.08 vehicles per household.

Although under §10.1.20 a waiver or more than 50% of the required parking spaces is allowed to be considered for affordable housing units, the evidence did not support the provision of less than one assigned space per unit for the residential units in this project, even though four of the units are anticipated to qualify as affordable housing units.

The availability and projected use of alternate transportation modes for this project warrants a waiver of twenty-five of the fifty off-street parking spaces that otherwise would be required for the residential units in this project.

Loading space for the café

One loading space is required for the café, but may be entirely waived under §10.1.20(d). There is sufficient parking along North Avenue in front of the proposed café to accommodate grocery and other deliveries to the café, as long as those deliveries are scheduled to occur in off-peak daytime hours. Moreover, such deliveries by truck could be accomplished along North Avenue with fewer maneuvers and less reversing than inside the garage entrance, and therefore would require less use of the trucks' required back-up beeper, which is preferable in a neighborhood with nearby residential uses. The proposal meets the requirements of the ordinance for waiver of the loading space for the café.

Parking spaces for the café

Without a waiver, the project requires ten off-street parking spaces for the café (see footnote 6 above). Appellant-Applicant seeks a waiver of 50% of the off-street parking spaces that would otherwise be required for the café, as provided by §10.1.19 of the Zoning Ordinance, based on the availability of alternate transportation modes, and based on data

regarding the local availability of unoccupied on-street parking spaces. However, Appellee-Applicant also proposed that only the two spaces in the garage nearest the entrance would be allocated to the café use during café hours (and at other times would be available to visitors to the condominiums), while the remaining three spaces in the garage would be allocated as second parking spaces to three of the condominium units. This proposal appears effectively to request a waiver of eight off-street parking spaces for the café use.

As discussed above, although the evidence showed ample on-street parking in the area to accommodate the café use between the hours of 7 a.m. and 8 p.m., the ordinance as it currently exists does not allow consideration of the availability of on-street parking to justify a waiver of the off-street parking requirements. Appellant-Applicant did not present evidence of its arrangement for the use of any off-street parking spaces on other commercial or institutional property along North Avenue that could be considered for waiver under the "unique use times" provision of §10.1.19 (or, if within 400 feet, could be considered as providing some of the required parking spaces for the café under §10.1.13).[7]

While Appellee-Applicant only proposed to allocate two spaces within the garage to the café use, there is no provision in the ordinance allowing waiver of more than 50% of the off-street parking spaces required for the café use. The project does not propose to obtain the use of off-street spaces in any other nearby commercial or institutional location. Accordingly, without consideration of any remote off-street spaces, the maximum allowable waiver under the present ordinance requires that all five of the remaining spaces in the garage be allocated to the café use during the hours of operation of the café.

Based on the density of residential occupancy of the surrounding area on both sides

---

[7] Any future proposal under these sections would have to be considered as an amendment application.

16

of North Avenue, and extrapolating from the data on the area residents' use of other modes of transportation to travel to work, at least 50% of the customers of the café are expected to originate in the surrounding area and to walk or bicycle to the café. Based on the availability and projected use of alternate modes of transportation, and with conditions as imposed below, a waiver of five of the required ten off-street parking spaces for the café is warranted.

Based on the foregoing, it is hereby ORDERED and ADJUDGED that the project is approved as proposed, with the conditions imposed by the DRB and the following additional conditions:

1) Window-mounted air conditioning units are prohibited; such prohibition shall also be incorporated in any lease agreement or deed governing any portion of this project.

2) The operation of the café shall be restricted to a size at which it requires no more than ten parking spaces, through a binding legal document such as a lease agreement, deed, or condominium agreement, unless and until the permittee obtains an amendment to this permit with regard to parking.

3) Five spaces within the garage shall be assigned to the café use during café hours, unless and until the permittee obtains an amendment to this permit with regard to parking.

4) As the evidence of the availability of on-street parking for café patrons did not extend past 8:00 p.m., the hours of operation of the café shall not extend past 8 p.m. unless and until the permittee obtains an amendment to this permit with regard to parking.

5) Café food waste shall be stored in a refrigerated unit inside the building until it is removed by a commercial waste handling company.

6) Deliveries to the café shall be scheduled so as not to coincide with the peak hours for traffic along North Avenue.

17

7) If either of the two more easterly cottonwood trees on the boundary of the Winant property that are expected to survive do not in fact survive within two growing seasons after construction, the permittee shall work with a professional arborist to offer the landowner the replacement of those trees with trees of an appropriate size and species to become established and grow successfully in or near the location of those two trees.

Appellee-Applicant shall prepare a judgment order for the Court's signature, also incorporating issues concluded by the summary judgment decision, and approved as to form by the other attorneys. If they do not agree, Appellee-Applicant's proposed judgment order shall be filed on or before September 12, 2007, and any party's objections to the form of the order shall be filed as soon as possible but not to exceed four business days after the filing of the proposed judgment order.

Dated at Berlin, Vermont, this 31st day of August, 2007.

_____
Merideth Wright
Environmental Judge